IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:04CR54 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| INGREAT NORRIS SWIFT, | ) | |
| | ) | |
| Defendant. | ) | |

      This matter is before the court on the motion to dismiss filed by Ingreat Norris Swift (Swift) (Filing No. 11). The federal grand jury indictment against Swift alleges Swift was convicted of a felony on March 15, 2001, and on December 28, 2002, was found in possession of a firearm; specifically, a Smith and Wesson .38 caliber revolver (Filing No. 1). The indictment charges Swift with being a felon in possession of a firearm in violation of 18 U.S.C §§ 922(g)(1) and 924(a)(2). The indictment was filed on January 23, 2004, and an arrest warrant was issued on January 26, 2004. Swift was arrested at a residence on Franklin Street in Omaha on May 12, 2005, (TR. 12-13), and Swift's initial appearance and arraignment were held before the court on May 13, 2005. Swift moved to dismiss the indictment on May 27, 2005 (Filing No. 11).

      Swift claims the indictment must be dismissed because he was denied his Sixth Amendment right to a speedy trial, and the government's undue pre-indictment delay violated his Fifth Amendment due process rights. An evidentiary hearing on the motion to dismiss was held on June 15, 2005. The hearing transcript was filed on June 22, 2005 (TR. - Filing No. 21). At the hearing, the court took judicial notice of the court's file; heard the testimony of government witness Bruce M. Ferrell (Officer Ferrell), who has twenty years of law enforcement experience as a police officer for the City of Omaha; and received into evidence a copy of the warrant for Swift's arrest and the photograph of Swift sent by Officer Ferrell to Florida authorities during the summer of 2004 (Ex. 1).

## FINDINGS OF FACT

The indictment against Swift arises from a December 28, 2002 arrest of Swift for being a felon in possession of a firearm. The arrest was made by an Omaha police officer.

Criminal charges against Swift for being a felon in possession of a firearm were initially pursued in the District Court of Douglas County, Nebraska. On January 5, 2004, prior to Swift's state trial, these charges were dismissed (TR. 5-6). Swift was thereafter indicted by a federal grand jury on January 23, 2004 (TR. 6). An arrest warrant was issued on January 26, 2004, and maintained by the court under seal until after Swift was arrested.

Arrests warrants are sealed pending a defendant's arrest for officer safety reasons. Defendants aware of a pending warrant for their arrest are often prepared to resist arrest when an officer approaches, and the accompanying risks of such encounters are further heightened when the warrant authorizes the arrest of a defendant, such as Swift, who have a known history and multiple prior convictions for possession of a firearm (TR. 15-16, 33). For similar safety reasons, the existence of an outstanding warrant for Swift's arrest was never publicized through Crime Stoppers (TR. 27).

Though the arrest warrant itself is sealed from public disclosure, pending warrants may be entered by a law enforcement agency in the National Crime Information Center (NCIC) database (TR. 16). The NCIC is a warrant information resource used by law enforcement officers to identify individuals with felony warrants who may have fled to other jurisdictions (TR. 16).

As of January 23, 2004, the Bureau of Alcohol, Tobacco, and Firearms (ATF) had a policy which required arrest warrants to be entered into the NCIC within forty-eight hours of issuance. Under this January 2004 ATF policy, if officers failed to enter an arrest warrant into NCIC within this forty-eight hour period, they were not permitted to enter the warrant into the system thereafter (TR. 17-19).

Due to a mistake by the ATF, the arrest warrant issued by this court on January 26, 2004, authorizing Swift's arrest was not entered into the NCIC within forty-eight hours. Therefore, it was not entered into NCIC until April 12, 2005, five days after the ATF policy was

modified to permit warrants to be entered in NCIC after the initial forty-eight hour period has elapsed (TR. 6, 19).

Although the arrest warrant was not within the NCIC system, law enforcement nonetheless attempted to locate and arrest Swift on many occasions prior to his arrest on May 12, 2005. Officer Ferrell was neither the officer who arrested Swift on December 28, 2002, nor an ATF officer. However, pursuant to a request made by the United States Attorney's office in late 2003 or early 2004, Officer Ferrell was tasked with attempting to locate Swift for execution of the federal arrest warrant (TR. 12, 14-15, 30-31).

In 2004, several warrant sweeps were conducted for wanted fugitives (including Swift) in the Omaha area. Swift's name and warrant were included in each of these sweeps (TR. 12). Officer Ferrell was personally involved in two of these warrant sweeps, both of which included attempting to locate Swift (TR. 12, 19, 24).

In the late spring of 2004, as part of a warrant sweep, Officer Ferrell and other Omaha police officers went to a residence on Saratoga Street in Omaha. The officers knocked on the door and asked if Swift was present. The person who responded at the door stated Swift was not there (TR. 12, 19-20). Essentially the same thing occurred when a warrant sweep was performed at this residence in the summer of 2004 (TR. 24).

Prior to performing either the spring or summer 2004 warrant sweep at the Saratoga residence, Officer Ferrell had received anonymous calls stating Swift had left the state (TR. 20-22). The Omaha law enforcement officers nonetheless contacted the residents of the Saratoga Street home because they believed that, when living in Omaha, Swift usually resided at this specific residence with his mother or grandmother (TR. 12, 19). When Swift was not living on Saratoga Street, he lived at residences rented or owned by women, and held under female names rather than Swift's name (TR. 21, 24). If Swift was not located at the Saratoga address, Swift's family would not cooperate with officers in helping to locate him (TR. 32). Therefore, when Swift was not located at the Saratoga Street home, the officers were left with very few leads to find Swift's current residence.

Officer Ferrell did not attempt to track Swift's movements by performing a credit card search because there was nothing to indicate Swift was using a credit card (TR. 27, 32).

Officer Ferrell did, however, receive anonymous phone calls concerning Swift's whereabouts, and the officer followed up on each of these leads (TR. 32). After receiving information from an anonymous caller indicating the defendant was in Duval County, Florida, in June 2004, Officer Ferrell spoke with detectives of the fugitive warrant office with Duval County. On June 28, 2004, Officer Ferrell e-mailed a photograph of Swift and faxed a copy of the warrant for Swift's arrest to a detective in Duval County (TR. 7-8, 21-22 & Ex. 1). Officer Ferrell was able to track Swift to a specific address in Duval County, Florida, but discovered Swift had moved a month earlier (TR. 8).

Officer Ferrell received another anonymous tip on July 24, 2004. The caller stated Swift now was in Hillsborough County, Florida. Officer Ferrell contacted the warrants and fugitive office of the Hillsborough County Sheriff's Office in Tampa, Florida, and, as with Duval County, provided Hillsborough County with a copy of the arrest warrant and photograph of Swift. Hillsborough County law enforcement was unable to locate Swift (TR. 9-10, 22).

On September 27, 2004, Officer Ferrell received several anonymous calls stating Swift was in Warner Robins, Georgia. Apparently, Swift had been in an automobile accident in or near Warner Robins. Officer Ferrell contacted the sheriff's office and police department in Warner Robins, Georgia, and the repair shop where Swift's vehicle was located.

Officer Ferrell told the repair shop manager that the vehicle owner was a wanted fugitive and asked the manager to call law enforcement if the defendant came to the shop to ask about the vehicle repairs. The manager stated Swift was using the name "Ronnie Smith," but documents in the vehicle indicated Swift received money from Omaha on September 19, 2004, under the alias "Jim Jones" (TR. 10-11, 25). All contacts with the repair shop concerning the progress on repairing the vehicle were made by a female, and the vehicle was never retrieved from the repair shop. Law enforcement officers could not locate Swift in Georgia (TR. 11).

On May 12, 2005, Swift was found by Officer Ferrell near a residence on Franklin Street in Omaha. Officer Ferrell had previously received information from several anonymous callers stating Swift was staying at a Motel 6 on 108th and L Streets in Omaha in a room registered under a female's name. Officer Ferrell contacted the hotel staff who identified

Swift's photograph, and provided the officer with the name of the woman who rented the room and a description of the vehicle Swift was driving (TR. 12-13, 26-28, 31). On May 12, 2005, Officer Ferrell spotted Swift's vehicle leaving the Franklin Street location. Officer Ferrell conducted a traffic stop of the vehicle and arrested Swift (TR. 27-28, 30-31). The NCIC system was used to verify the arrest warrant for Swift was still active, but Swift was ultimately found through Officer Ferrell's investigative efforts and not because the warrant for Swift's arrest was entered into NCIC on April 12, 2005 (TR. 30-31).

## LEGAL ANALYSIS

Swift claims the indictment against him must be dismissed because the government has violated his rights under both the Fifth and Sixth Amendments. Swift claims the government's pre-indictment delay prejudiced his right to due process guaranteed under the Fifth Amendment, and the government's post-indictment delay in arresting Swift violated his Sixth Amendment right to a speedy trial.

### I.     Fifth Amendment Due Process: Pre-indictment Delay.

Swift's Fifth Amendment claim for pre-indictment delay focuses on the time period between December 28, 2002, when Swift was found in possession of a firearm, and January 23, 2004, when Swift was indicted by a federal grand jury. Pre-indictment delay may warrant "dismissal of an indictment where the delay is unreasonable and the defendant is actually and substantially prejudiced in the presentation of [his] case." ***United States v. Brockman***, 183 F.3d 891, 895 (8th Cir. 1999). The court generally considers the actual and substantial prejudice issue first is assessing whether pre-indictment delay violated a defendant's Fifth Amendment rights. ***Brockman***, 183 F.3d at 895 (**citing *United States v. Benshop***, 138 F.3d 1229, 1234 (8th Cir. 1998).

The defendant has the burden of proving actual and substantial prejudice attributable to pre-indictment delay. ***Brockman***, 183 F.3d at 895 (**citing *United States v. Lovasco***, 431 U.S. 783, 789-90 (1977)). To meet this burden, the defendant cannot rely on speculative or conclusory claims of possible prejudice resulting from the passage of time. The defendant

5

must specifically identify witnesses or documents lost due to delay caused by the government, relate the substance of this missing evidence "in sufficient detail to permit a court to assess accurately whether the information is material to the accused's defense," and "show that the lost testimony or information is not available through another source." **Brockman**, 183 F.3d at 895 (**citing United States v. Bartlett**, 794 F.2d 1285, 1289-90 (8th Cir. 1986)).

Swift has presented no evidence that any material witness testimony or documents are unavailable for his defense due to the delay between his December 28, 2002 arrest and the January 23, 2004 federal indictment. He has therefore failed to prove any "actual and substantial prejudice" attributable to pre-indictment delay warranting dismissal of the indictment under the Fifth Amendment. **Cf. Brockman**, 183 F.3d at 895 (**holding** defendant failed to prove prejudice resulting from five-year pre-indictment delay even though four witnesses had died, because the same testimony was available through other witnesses).

## II.     Sixth Amendment Right to a Speedy Trial.

Swift's Sixth Amendment claim for post-indictment delay focuses on the time period from January 23, 2004, when a federal grand jury indicted Swift, and May 12, 2005, when Swift was arrested on that indictment. Swift claims the government's failure to promptly execute the federal warrant for Swift's arrest violated his right to a speedy trial.

Courts apply a balancing test to determine whether the Sixth Amendment right to a speedy trial has been violated. **Barker v. Wingo**, 407 U.S. 514, 530 (1972). Four factors are considered when applying the Sixth Amendment balancing test: the length of delay, the reason for delay, whether the defendant asserted the right to a speedy trial, and whether the defendant suffered any prejudice. **Barker**, 407 U.S. at 530; **United States v. Titlbach**, 339 F.3d 692, 699 (8th Cir. 2003).

### 1.     Length of Delay.

The first factor, length of delay, serves as a triggering device in the **Barker** analysis. In this case, the delay between the indictment and Swift's arrest (January 23, 2004, through May 12, 2005) was nearly sixteen months. Generally, a delay exceeding a year is

presumptively prejudicial. ***United States v. Brown***, 325 F.3d 1032, 1035 (8th Cir. 2003); ***United States v. Sprouts***, 282 F.3d 1037, 1042 (8th Cir. 2002); ***United States v. Walker***, 92 F.3d 714, 717 (8th Cir. 1996) (**citing** ***Doggett v. United States***, 505 U.S. 647, 652 n.1 (1992)). However, the mere finding of "presumptively prejudicial" delay does not justify the severe remedy of automatically dismissing an indictment, but rather triggers the court's obligation to consider the remaining ***Barker*** factors. ***Barker***, 407 U.S. at 530; ***United States v. Richards***, 707 F.2d 995, 997 (8th Cir. 1983) (though 35-month delay between indictment and arrest was presumptively prejudicial, trial court's dismissal of the indictment was reversed where marshals had been unable to locate the defendant because the defendant was residing at his parents' home, the parents told marshals the defendant was not there and provided no additional addresses, and the defendant continued to use only his parents' address).

Since an almost 16-month delay extends beyond the one-year threshold supporting a finding of presumptive prejudice, the length of delay factor weighs in Swift's favor and requires an inquiry into the remaining ***Barker*** factors.

### 2. Reason for Delay.

The second ***Barker*** factor involves assessing who is responsible for the delay-- the defendant or the government. The government's intentional delay in locating a defendant will weigh heavily against it. ***Walker***, 92 F.3d at 717 (**citing** ***Barker***, 407 U.S. at 531). Negligence weighs less heavily against the government but is still a considerable factor. ***Walker***, 92 F.3d at 717 (**citing** ***Doggett***, 505 U.S. at 652-53). On the other hand, delays attributable to a defendant's own evasive and deceptive conduct in attempting to remain hidden weighs against any finding of delay caused by the government's "diligent attempt to delay the trial in order to hamper the defense." ***United States v. Weber***, 479 F.2d 331, 332-33 (8th Cir. 1973).

In claiming the government failed to diligently pursue Swift's arrest, Swift relies heavily on the ATF's failure to enter Swift's arrest warrant into the NCIC. While it is true that ATF did not promptly post Swift's arrest warrant in the NCIC system, and was thereby foreclosed by its own policy from entering the information until a policy change more than a year later, there

is no evidence the ATF's conduct was anything more than a negligent oversight. More importantly, there is no evidence this alleged oversight caused any delay in locating and arresting Swift. Even after Swift's name was entered in the NCIC, the government's ultimate success in locating Swift rested on the labors of observant police officers and not NCIC computer entries.

Other than this oversight by the ATF, the government was reasonably diligent in pursuing Swift's arrest. The Omaha Police Department conducted numerous warrant sweeps in 2004; the warrant for Swift's arrest was included among those contacts. Officer Ferrell was personally involved in two such sweeps where a resident at Swift's last and only known address (the home of either his mother or grandmother) was directly contacted to locate Swift. Swift and his family members had prior encounters with law enforcement, and Swift's relatives were historically uncooperative with authorities. Swift was not found during the 2004 warrant sweeps.

In addition to the warrant sweeps, Officer Ferrell responded to every anonymous tip received, and thereby traced Swift's movements to Florida and then to Georgia. Officer Ferrell personally attempted to locate Swift in both Florida and Georgia, provided authorities in both states with a copy of the arrest warrant and a photograph of Swift, and enlisted the aid of Georgia law enforcement and the manager of a Georgia automobile repair shop to locate Swift, all to no avail.

Officer Ferrell's efforts, and the efforts of Florida and Georgia authorities, were thwarted by Swift's own evasive conduct. Swift was traced to a specific residence in Duval County, Florida, but moved before Officer Ferrell located him. Swift used aliases in Georgia -- "Ronnie Smith" in contacts with the vehicle repair shop, and "Jim Jones" when receiving money from Omaha. Swift used female intermediaries to contact the repair shop to inquire about his vehicle repairs, and he ultimately never retrieved the vehicle. There is no evidence Swift used credit cards through which law enforcement could trace Swift's movements and locations. Simply stated, the evidence reflects Swift attempted to conceal his whereabouts by relocating to Florida, relocating within Florida, moving on to Georgia, using false names,

and avoiding making any contacts or creating any paper trail which could expose his current location.

In light of the evidence presented, the Court concludes that the delay in arresting Swift is substantially more attributable to Swift's conduct than any lack of diligence by the government.  **See *Walker***, 92 F.3d at 718 (where the government entered defendant's information in NCIC and performed follow up every six months, but defendant had fled from Nebraska to California, disguised his identity and used false names, and there was no evidence defendant used a credit card, the defendant was responsible for the 37-month delay in arrest despite the FBI's failure to search for the defendant at his parents' California home). The second factor of the ***Barker*** balancing test weighs heavily in favor of the government.

### 3.     Swift's Assertion of His Right to a Speedy Trial.

The third ***Barker*** factor, whether the defendant asserted his right to a speedy trial, runs in favor of Swift. A defendant's assertion of his right to a speedy trial, "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." ***Barker***, 407 U.S. at 531-32.

If Swift knew of or suspected the existence of a federal indictment and outstanding federal warrant for his arrest, but he did not contact authorities and instead attempted to avoid arrest, these facts would weigh against any claim that Swift wanted or demanded a speedy trial. However, the government presented no evidence to indicate Swift knew of the indictment prior to his arrest. Although it may be inferred that Swift was told, through relatives, friends, or accomplices, of the Omaha warrant sweeps to locate Swift, and Swift moved to Florida and Georgia and used aliases to avoid being arrested on the outstanding federal warrant, it is also plausible that he was unaware of the federal indictment, left the state, and hid his whereabouts for other reasons. A defendant "is not to be taxed for invoking his speedy trial right only after his arrest" when there is no evidence that defendant was aware of the criminal charges filed against him prior to his arrest. ***Doggett***, 505 U.S. at 653-54.

Swift was arrested on May 12, 2005, and on May 27, 2005, filed a motion to dismiss the indictment for violation of his Sixth Amendment right to a speedy trial. Swift's motion to

9

dismiss notified the government of the potential violation of Swift's constitutional right. Swift's prompt filing of a motion to dismiss weighs in favor of finding Swift is conscientiously asserting his Sixth Amendment rights.

### 4. Prejudice Suffered by Swift.

There are three types of harm caused by unreasonably delays between indictment and trial: (1) oppressive pretrial incarceration; (2) anxiety and concern; or (3) impairment to the defense. ***Doggett***, 505 U.S. at 654. Swift did not suffer oppressive pretrial incarceration because he was not incarcerated until his arrest. Swift did not prove he suffered pretrial anxiety or concern, and the court cannot infer pretrial anxiety or concern because there is no evidence he was aware of the indictment against him until he was arrested. Nor did Swift present evidence that his defense was impaired.

The prejudice factor of ***Barker*** is related to the reasonableness with which the government pursued a defendant. ***Doggett***, 505 U.S. at 654-58; ***Brown***, 325 F.3d at 1034-35; ***Walker***, 92 F.3d at 719. If the government "pursued [a defendant] with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail. Indeed, that conclusion would generally follow as a matter of course however great the delay, so long as [the defendant] could not show specific prejudice to his defense. ***Doggett***, 505 U.S. at 656. However, if the government delays arresting a defendant to gain a tactical advantage, the government's bad faith weighs heavily against the government and presents an "overwhelming case for dismissal." ***Doggett***, 505 U.S. at 656. Delays caused by the government's negligence occupy the middle ground. The ability to tolerate such negligence varies inversely with how much delay was actually caused by the negligent conduct. "[N]egligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice." ***Doggett***, 505 U.S. at 657.

As previously discussed, it is undisputed that ATF failed to promptly enter the arrest warrant for Swift into the NCIC database, but the court has already concluded this was a mere oversight and not an intentional act. There is no evidence this oversight by ATF caused delay in apprehending Swift. The delayed arrest was substantially caused by Swift's conduct.

Despite Swift's attempts to remain hidden, he was found within sixteen months of being indicted. **Cf. *Doggett***, 505 U.S. at 657 (delay of 81/2 years between indictment and arrest due to government's inexcusable oversights warranted dismissal). There is no evidence of actual prejudice to the defense; there is no evidence of missing witnesses, failed memories, or lost or destroyed physical evidence. The fourth element of the ***Barker*** test weighs heavily in favor of the government inasmuch as Swift has not shown sufficient prejudice under the standards discussed in ***Doggett***.

The ***Barker*** factors, on balance, weigh in favor of the government. Though post-indictment delay occurred, it is primarily, if not solely, attributable to Swift's conduct. Moreover, Swift has failed to show any actual prejudice to his trial defense arising from either pre- or post-indictment delay. The court therefore concludes Swift's motion to dismiss should be denied.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that**:

Ingreat Norris Swift's motion to dismiss (Filing No. 11) be denied.

### ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 5th day of August, 2005.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge